UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Ellsworth W. Matthews,

     Plaintiff,

     v.                               Civil Action No. 1:13-cv-195

Commissioner of Social Security,

     Defendant.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 6, 11)

Plaintiff Ellsworth Matthews brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Matthews's motion to reverse the Commissioner's decision (Doc. 6), and the Commissioner's motion to affirm the same (Doc. 11). For the reasons stated below, I recommend that Matthews's motion be GRANTED, the Commissioner's motion be DENIED, and the matter be REMANDED for further proceedings and a new decision.

## <u>Background</u>

Matthews was 38 years old on his alleged disability onset date of April 7, 2007. Although he graduated from high school, he has a learning disability resulting in reading skills at only a third-grade level and math skills at only a fifth-grade level. (AR 34–35,

756, 862.)  He has held jobs as a car shuttle driver, a trash collector, a landscape laborer, and a construction laborer.  (AR 353–54, 367–75.)  He has also worked as a volunteer firefighter.  (AR 46–47.)  At the time of the administrative hearing, he was living with his girlfriend and her father.  (AR 35.)  He has no children and has never been married.  (*Id.*)

Matthews was in special education classes throughout school.  (AR 429, 432, 888.)  When he was in the seventh grade, his basic skills were tested and he scored below the first percentile in reading achievement and his overall reading skills were described as "severely defici[en]t."  (AR 430.)  He scored at only the first percentile in math achievement.  (*Id.*)  Matthews was tested again in 2009, and his reading scores were at the first percentile or below while his math scores were at the seventh percentile.  (AR 756.)  He testified at the administrative hearing that he is unable to follow directions (AR 34) and "can't even read a newspaper" (AR 138).  In addition to his cognitive limitations, Matthews suffers from obesity, obstructive sleep apnea, insomnia, and pain in his knees and left ankle as a result of osteoarthritis.  (AR 558, 727–28, 790, 889, 934.)

In June 2009, Matthews filed applications for social security income and disability insurance benefits.  In his disability application, he alleged that he became unable to work on April 7, 2007 as a result of "depression/anxiety, sleep apnea, slow learner, migraine headaches, seizures, . . ., shattered left ankle, knee pain, lower back pain[,] unable to sleep, . . . [and] high blood pressure."  (AR 352.)  He further alleged that he is unable to lift, carry, or stand for long periods due to ankle and knee pain, is unable to concentrate or follow instructions well, and is "always tired."  (*Id.*)  Matthews's application was denied initially and on reconsideration, and he timely requested an administrative

hearing.  The hearing was conducted on February 10, 2011 by Administrative Law Judge ("ALJ") Paul Martin.  (AR 28–86.)  Matthews appeared and testified, and was represented by an attorney.  A vocational expert ("VE") also appeared and testified at the hearing.  A second hearing was held on July 5, 2011 for the principal purpose of further questioning the VE.  (AR 87–145.)  On September 23, 2011, the ALJ issued a decision finding that Matthews was not disabled from his alleged disability onset date through the date of the decision.  (AR 9–20.)  Thereafter, the Appeals Council denied Matthews's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies, Matthews filed the Complaint in this case on July 12, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

3

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that, although there was conflicting evidence in the file and Matthews had engaged in some work activity during the alleged disability period, he had not engaged in substantial gainful activity.  (AR 11–12.)  At step two, the ALJ found that Matthews had the following severe impairments: "osteoarthritis in the knees, status post fracture of the left ankle, sleep apnea, obesity[,] and a learning disability."  (AR 12.)  Conversely, the ALJ found that Matthews's hypertension, migraine headaches, carpal tunnel syndrome, anxiety, and depression were nonsevere.  (AR 12–13.)  At step three, the ALJ found that none of

Matthews's impairments, alone or in combination, met or medically equaled a listed

impairment.  (AR 13–14.)

Next, the ALJ determined that Matthews had the RFC to perform "light work," as

defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Matthews] is limited from standing/walking for more than 2 hours total during the day.  He needs to take breaks every 30 minutes to stretch and to change positions.  He is unable to climb ladders.  He can occasionally balance and stoop, but cannot crouch or crawl.  He is limited from more than occasional operation of foot controls with the left foot.  He needs to avoid exposure to environmental pollutants.  He is limited to understanding and carrying out 1-3[-]step tasks and can sustain attention for 2-hour periods to perform such tasks.  He may need a little extra assistance initially in order to learn new tasks, but not after the normal learning period.  He is able to sustain normal social interactions and to adapt to normal workplace situations.

(AR 15.)  Given this RFC, the ALJ found that Matthews was unable to perform his past

relevant work as a car shuttle driver, a trash collector, a landscape laborer, and a

construction laborer.  (AR 17.)  Based on testimony from the VE, however, the ALJ

determined that Matthews could perform other jobs existing in significant numbers in the

national economy.  (AR 18–19.)  The ALJ concluded that Matthews had not been under a

disability from the alleged disability onset date of April 7, 2007 through the date of the

decision.  (AR 19–20.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

**I.      ALJ's Analysis of Dr. Diercksen's Opinions**

Matthews argues that the ALJ erred in his analysis of the medical opinions of

treating physician Dr. H. Peter Diercksen.  According to Matthews, Dr. Diercksen's

opinions are supported by and consistent with the medical evidence of record and thus

should have been afforded significant, if not controlling, weight.  The Commissioner

disagrees, contending that the ALJ committed no error in his analysis of Dr. Diercksen's

opinions and that these opinions are supported by substantial evidence.  For the reasons

discussed below, I find that the ALJ committed legal error in his analysis of Dr.

Deircksen's opinions, and thus the matter should be remanded.

Dr. Diercksen is a family practitioner who has been treating Matthews for over 30

years.  (AR 933.)  In March 2010, Dr. Diercksen completed a "Treating Source Statement

– Physical" wherein he stated that Matthews could read and write at only a third-grade

level, and had severe obstructive sleep apnea with fatigue and chronic migraines.  (AR

862.)  Based on Matthews's medical history, office visit examinations, and test results,

Dr. Diercksen checked off boxes indicating that Matthews demonstrated the following

medical signs and findings: pain, tenderness, swelling, weakness, obesity, frequent and

severe headaches, shortness of breath, sleep apnea, impaired sleep, nonrestorative sleep,

daytime somnolence, difficulty solving problems and remembering, and problems with

speech/communication.  (*Id.*)  Dr. Diercksen indicated that Matthews would be off task

for three to four hours in a typical workday due to pain, fatigue, or other symptoms.  (AR

863.)  He further indicated that Matthews could lift only up to 10 pounds for four hours in

an eight-hour workday; could never carry any weight; could sit for up to three hours and stand/walk for up to four hours in an eight-hour workday; and could reach overhead for only 15 minutes and operate foot controls with his left foot for only two hours in an eight-hour workday. (AR 863–64.) Dr. Diercksen opined that Matthews would need a job which permitted him to shift positions at will, would need to walk around for about five minutes every 30 minutes, and would need to take unscheduled breaks for about 20 minutes every two hours. (*Id.*) Dr. Diercksen also assessed several postural limitations, including an inability to balance/stoop, and an ability to climb stairs and ramps, kneel, crouch, and crawl for only about 30 minutes in an eight-hour workday. (AR 865.) Finally, Dr. Diercksen opined that Matthews was likely to be absent from work for more than four days each month, on average, as a result of his impairments. (AR 866.)

A little over a year later, in June 2011, Dr. Diercksen completed a questionnaire wherein he checked boxes indicating that Matthews had no useful ability to understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; complete a normal workday and workweek; and make simple work-related decisions. (AR 932.) Dr. Diercksen stated that he did not believe Matthews could work "at all." (AR 933.) Finally, in a June 2011 letter opinion, Dr. Diercksen stated as follows:

> [Matthews] has a number of medical problems that restrict him from working. Besides [his mental/cognitive problems], he also has marked fatigue, which is probably from his obstructive sleep apnea, but he is already on CPAP for that. He also has marked obesity with a BMI of 50.2. He has osteoarthritis in his knees and ankles and this restricts him from doing any amount of work that involves standing, walking, or anything else where he needs to use his legs.

8

(AR 934.)   The ALJ afforded "some, but not controlling[,]" weight to Dr. Diercksen's opinions.[1]  (AR 17.)

A treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Where, as here, an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so. *Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).  The Second Circuit has consistently held that the failure to provide "good reasons" for not crediting the opinions of a claimant's treating physician is a ground for remand.  *Sanders v. Comm'r Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (citing *Schaal*, 134. F.3d at 505; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.")).

Here, the ALJ did not provide good reasons for affording only "some" weight to Dr. Diercksen's opinions, and substantial evidence does not support the ALJ's analysis of these opinions.  The ALJ gave three reasons for affording only some weight to Dr.

---

[1]  The ALJ's statement that he afforded "some" weight to Dr. Diercksen's opinions is vague: is "some" a substantial amount or just a little?  A comparison of the ALJ's RFC determination and Dr. Diercksen's opinions reveals that, in fact, the ALJ afforded little weight to these opinions.

Diercksen's opinions: (1) Dr. Diercksen "did not provide clinical observations to support [his opinions]"; (2) the opinions are "not well supported by [Dr. Diercksen's] own clinical observations"; and (3) the opinions are "inconsistent with other substantial evidence of record," including the opinions of nonexamining agency consultants Drs. Francis Cook, Geoffrey Knisely, Ellen Atkins, and William Farrell.  (AR 17.)  First, there is no requirement that treating physicians provide clinical observations in their opinions to support those opinions.  Rather, as stated above, the applicable regulation states that a treating physician's opinions are given "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

Second, Dr. Diercksen's opinions are in fact well supported by medically acceptable clinical and laboratory diagnostic techniques.  As noted by treating orthopedist Dr. William Lighthart in August 2009, radiographs of Matthews's knees demonstrated "near complete loss of medial joint space bilaterally."  (AR 790.)  Dr. Lighthart also noted that radiographs of Matthews's left ankle demonstrated "some loss of joint space, subchondral sclerosis, anterior and posterior osteophytes off of the tibia, and in general [degenerative joint disease] of the ankle."  (*Id.*)  Dr. Lighthart concluded that Matthews had "[a]rthritis of both knees and posttraumatic arthritis of the left ankle."  (*Id.*)  Radiographs such as these are clearly considered "medically acceptable clinical and laboratory diagnostic techniques" under the treating physician rule.  *See* 20 C.F.R. § 1528(c) ("Laboratory findings are anatomical, physiological, or psychological

phenomena which can be shown by the use of medically acceptable laboratory diagnostic

techniques . . . includ[ing] chemical tests, electrophysiological studies

(electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and

psychological tests.").  Dr. Lighthart also recorded the following signs and symptoms

based on his examination of Matthews:

> He has loss of dorsiflexion of the left ankle of approximately 10 degrees
> compared to the right . . . .  He has tenderness to palpation along the medial
> and lateral gutters, . . . and has pain with palpation over the anteromedial
> joint line and the ankle.  He has tenderness to palpation in both knees along
> the medial joint line . . . .

(AR 790.)  Dr. Diercksen himself made the following observations regarding Matthews's

knee and ankle pain in a September 2009 treatment note:

> The onset of the knee pain has been gradual . . . and has been occurring in a
> persistent pattern for 2 years.  The knee pain is moderate to severe.  [It] is
> characterized as a sharp stabbing (with burning) [and] . . . is described as
> being located in the anterior knee.  The knee pain is aggravated by physical
> activity, any movement, twisting, squatting, kneeling, climbing[] stairs[,]
> and prolonged standing.  The knee pain is relieved by rest.  The symptoms
> have been associated with painful [range of motion].  [It] was prece[]ded by
> trauma (shattered ankle).  [Matthews] was seen by [an] ortho[pedist] for
> this and had his [medications] changed and does feel sl[ightly] better with
> this – he is going to follow[ ]up with them.

(AR 786.)  Other medical providers also noticed Matthews's physical limitations due to

knee and ankle pain.  For example, examining consulting psychologist, Dr. Dean

Mooney, stated in a Disability Evaluation: "[Matthews] appeared to have physical

difficulty walking to the evaluation room, as he walked slowly while shuffling."  (AR

813.)  And a Social Security Administration ("SSA") Field Officer stated in a Disability

Report that Matthews had difficulty walking.  (AR 349.)

Regarding Matthews's sleep apnea and obesity, Dr. Diercksen stated in a September 2009 treatment note: "Sleep apnea has been occurring for years. [It] has been occurring in [a] constant pattern. [It] is described as severe [and] . . . is characterized as a choking. The symptoms have been associated with obesity." (AR 786.) Dr. Diercksen's sleep apnea findings are supported by sleep studies conducted in 2004 and 2009. (AR 555–62, 727–29.) Dr. Diercksen's consistent reference to Matthews's obesity, and his opinion that it exacerbates Matthews's other impairments including his knee pain and sleep apnea, is supported by Social Security Ruling 02-01p, which states: "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." SSR 02-1p, 2000 WL 628049, at *6 (Sept. 12, 2002). The Ruling also states: "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." *Id.*

Not only are Dr. Diercksen's opinions regarding Matthews's physical limitations supported by diagnostic reports and clinical findings, there is no evidence in the record which is inconsistent with these opinions. As partial justification for his decision to afford limited weight to Dr. Diercksen's opinions, the ALJ pointed out that, although Dr. Diercksen opined that Matthews could lift no more than 10 pounds occasionally, Matthews reported that he could lift 35 pounds. (AR 17.) A more detailed review of these statements, however, reveals they are not inconsistent. Matthews wrote in his

Function Report, "I can leif 35 pels for litrell wiwell" (AR 329), presumably meaning, "I can lift 35 pounds *for a little while*" (emphasis added).  This is not inconsistent with Dr. Diercksen's opinion that Matthews could lift only 10 pounds "[i]n a competitive work environment, during an 8-hour workday, on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule."  (AR 863.)  And the more relevant amount of weight, for purposes of determining Matthews's RFC, is the amount Matthews could lift "on a regular and continuing basis."  20 C.F.R. § 404.1545(b).  The ALJ also noted that Dr. Dierckson stated in a December 2010 treatment note that Matthews "was exercising regularly in that he was 'active at work each day.'"  (AR 17 (quoting AR 900).)  But the ALJ himself found that any work Matthews was able to do during the alleged disability period was below the substantial gainful activity level (AR 11–12), and the record does not indicate otherwise.  Moreover, despite this passing statement in one of Dr. Diercksen's treatment notes, the record taken as a whole does not indicate that Matthews was working more than on a part-time, inconsistent, and irregular basis in a noncompetitive work environment during the alleged disability period.

Like his opinions regarding Matthews's physical limitations, Dr. Diercksen's opinions regarding Matthews's mental limitations are supported by diagnostic reports and clinical findings, as well as by the opinions of other providers.  For example, after testing, a 1982 school report concluded that Matthews "ha[d] a specific learning disability . . . effecting his acquisition of basic skills and [requiring] special education intervention."  (AR 432.)  March 2009 testing revealed grade-level scores of 2.6 for word reading, 2.8 for sentence comprehension, 1.1 for spelling, and 5.2 for math computation.  (AR 756.)

In an April 2009 Psychological Evaluation, after testing and interviewing, psychologist Marc Carpenter concluded that, although Matthews was "not in the range of Mental Retardation" for purposes of qualifying for developmental services, he had "extremely low adaptive skills" and "very large discrepancies between some index scores on the intelligence test," requiring further investigation.  (AR 891.)  Similarly, in a September 2009 Disability Evaluation, after testing and examination, psychologist Dr. Mooney found that Matthews had mild cognitive impairment; that his attention, concentration, and delayed recall were impaired; and that he was unable to write a complete sentence.  (AR 817.)  Dr. Mooney further found that Matthews was not capable of managing funds on his own behalf and that the prognosis for his mental health condition was "guarded." (AR 818.)  Dr. Mooney concluded:

> [Matthews] experiences physical health issues (chronic pain, arthritis, fatigue, etc.) daily that are . . . inhibiting his daily functioning[] and exacerbating his mental health issues.  Due to his limited knowledge base, which may be the result of cognitive deficits, accompanied by physical health issues, he has had extreme difficulty obtaining employment.  It is recommended that he become involved in psychotherapy to assist in managing his mental health issues, especially the frustrations and anxieties regarding . . . his medical issues.  He should maintain contact with his primary care physician[] and specialists whom he already sees, to monitor his medical issues[] and overall physical health.  He should also maintain contact with his vocational rehabilitation counselor.

(*Id.*)

Dr. Diercksen himself wrote about Matthews's learning disability and resulting limitations in an April 2009 treatment note:

> [Matthews] cannot read much past the first[-]grade level, cannot read a newspaper whatsoever or write well either.  This obviously affects his being able to get a job. . . .  According to [his] brother he also has trouble

caring for himself.  He doesn't bath[e] as he should or clean his apartment like he should or eat like he should. . . .

. . .

[Matthews] is willing to work but can't find anything but is also very restricted in what he can do because of his problems with reading and writing.

(AR 692.)  Matthews's cognitive limitations were also observed by a SSA Field Officer, who noted in a Disability Report that Matthews had difficulty reading, understanding, and answering questions.  (AR 349.)  The Field Officer stated:  "[I]t was clear [Matthews] had very limited IQ, [his representative] continually told him he would explain later.  [I] then slowed down and made sure to rephrase questions and statements to a level he could understand."  (*Id.*)  The SSA requires that ALJs consider observations like these, stating in Social Security Ruling 96-7p:  "The [ALJ] must . . . consider any observations about the [claimant] recorded by . . . SSA[] employees during interviews, whether in person or by telephone."  SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The only medical opinions cited by the ALJ as being "inconsistent" with the opinions of treating physician Dr. Diercksen are the opinions of agency consultants Drs. Cook, Knisely, Atkins, and Farrell, to which the ALJ afforded "greater weight" than to those of Dr. Diercksen because they "are quite consistent with each other and with various reports of [Matthews's] activity level."  (AR 17.)  But the ALJ failed to consider that none of these agency consultants examined or treated Matthews, in contrast to Dr. Diercksen, who treated Matthews for over 30 years (AR 933).  In general, "the written reports of medical advisors who have not personally examined the claimant deserve little

weight in the overall evaluation of disability [because t]he advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (internal quotation marks omitted).  Another significant omission, the ALJ failed to recognize that each of the consultants' reports was prepared before Dr. Diercksen prepared his opinions (*see* AR 823, 846, 853, 861, 866, 933–34), and thus none of the consultants had the opportunity to consider Dr. Diercksen's opinions in their reports.  *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether an agency consultant reviewed "all of [plaintiff's] relevant medical information," consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician).  In fact, Dr. Cook and Dr. Knisely checked off boxes stating that there was "[n]o" medical source statement regarding Matthews's physical capacities in the file.  (AR 845, 860.)  It is not clear if the ALJ was even aware of this deficiency in the consultants' reports, given his failure to mention it in his decision.

Citing to this Court's decision in *Carpenter v. Astrue*, No. 5:10-cv-249, 2011 WL 3951623, at *6 (D. Vt. Sept. 7, 2011), the Commissioner argues that the ALJ did not err in accepting some portions of Dr. Diercksen's opinions while rejecting others.  The Court held in *Carpenter*, however, that although it is permissible for an ALJ to reject certain findings of a provider while affording great weight to others, "an ALJ cannot, . . . without further explanation, simply reject all evidence from a treating physician because one component of the treating physician's opinions is unsupported and conclusory.  Instead, the ALJ must weigh all of the evidence and make a disability determination based on the

totality of that evidence." *Id.* (internal quotation marks omitted). Here, as discussed above, Dr. Diercksen's opinions are largely supported by the record, including objective medical evidence documenting medical signs and laboratory findings. The Commissioner correctly asserts that, in general, ALJs are "entitled to use discretion in weighing the medical evidence as a whole." (Doc. 11 at 8 (citing *Veino v. Barnhart*, 312 F.3d 578, 587–88 (2d Cir. 2002).) But ALJs are still required to follow the regulations, particularly in assessing the weight of a treating physician's opinions. *See* 20 C.F.R. § 404.1527(c)(2); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) ("The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."); *Burgess*, 537 F.3d at 129 ("even when a treating physician's opinion is not given 'controlling' weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive"); *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("the opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians"). Here, the ALJ's failure to consider four important factors in assessing the weight of Dr. Diercksen's opinions—(1) that Dr. Diercksen examined Matthews and the agency consultants did not; (2) the length of Dr. Diercksen's treatment relationship with Matthews, particularly in comparison to the lack of any relationship between the agency consultants and Matthews; (3) the agency consultants' failure to review Dr. Diercksen's opinions prior to preparing their reports; and (4) that Dr. Diercksen's opinions are consistent with and supported by the record as a whole, including objective medical evidence—requires remand.

**II.     ALJ's Consideration of Matthews's Education as a Vocational Factor**

Remand is also required because the ALJ's hypothetical to the VE did not accurately reflect Matthews's education level, and thus the ALJ failed to meet his burden at step five.  Where, as here, the claimant has been successful at step four of the sequential analysis in showing that he is unable to perform his past relevant work, the Commissioner has the burden at step five to prove that "the claimant still retains a [RFC] to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  In the ordinary case, the Commissioner satisfies this burden by resorting to the applicable medical vocational guidelines.  *Id.*; *see* 20 C.F.R. pt. 404, subpt. P, app. 2 (1986).  But where the claimant suffers from additional nonexertional impairments which have "any more than a 'negligible' impact on [his] ability to perform the full range of work," the ALJ cannot rely on the guidelines and instead must obtain the testimony of a VE.  *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)).  Here, the ALJ found that the guidelines did not apply because Matthews's ability to work was "impeded by additional limitations."  (AR 18.)  Thus, the ALJ consulted with a VE to determine "the extent to which these limitations erode the unskilled light occupational base."  (*Id.*)

At the first administrative hearing, the VE testified that there would be no jobs for an individual who was "functionally illiterate," which the VE appeared to equate with an individual who had a reading level "at approximately third grade" with "a very basic level of reading," or "below a GED level [of] one."  (AR 74.)  At the second

administrative hearing, the VE clarified this testimony, stating that none of the

occupations she had previously testified to could be performed if the hypothetical

individual was "functionally illiterate," meaning "reading at the third grade [level] or

less." (AR 142.) The evidence establishes that Matthews is able to read at only a third-

grade level or less. (*See* AR 34–35, 756, 862.) Specifically, as noted above, Wide Range

Achievement Test ("WRAT") results from June 2009 show a grade-equivalence score of

2.6 for reading ability, placing Matthews in the "Lower Extreme" category and in only

the first percentile for his age population. (AR 756.) His WRAT sentence

comprehension and spelling-grade equivalence scores are 2.8 and 1.1, respectively, also

in the "Lower Extreme" category. (*Id.*) Based on these scores and other indicators, Dr.

Diercksen opined in March 2010 that Matthews could read and write at only the third-

grade level.[2] (AR 862.) Therefore, by the VE's own definition, Matthews is functionally

illiterate, even though he was able to complete high school. The ALJ did not accurately

account for this limitation in his hypotheticals to the VE and consistently relied on

Matthews having a "high school education albeit with special assistance to address his

learning disability" at step five of his decision. (AR 19.)

Matthews points out that the Sixth Circuit addressed facts similar to those at issue

here in *Skinner v. Secretary of Health & Human Services*, 902 F.2d 447, 449–51 (6th Cir.

1990). (Doc. 6 at 16–17.) Although the Commissioner does not address the case, I find

it persuasive. In *Skinner*, like here, the claimant scored results on the WRAT test which

---

[2] In addition, Matthews testified that, although he could read some street signs, he could not read a menu or a newspaper and he could read very little of his mail. (AR 34–35, 138.) Matthews's writing limitations are clearly demonstrated in the responses prepared by him in his Function Report and Pain Report. (AR 325–30, 333–38.)

correlated to a reading level below third grade; the VE testified that "a person who reads and writes on the third grade level is functionally illiterate"; and yet the ALJ found that the claimant possessed a marginal education and thus was capable of performing a limited range of light work. *Skinner*, 902 F.2d at 448–49.  The Sixth Circuit held that the ALJ erred in concluding that the claimant possessed a marginal education, as "[t]he record does not support the ALJ's characterization of Skinner's educational preparation. In fact, the record provides overwhelming evidence that Mr. Skinner is illiterate." *Id.* at 450.  The court also found error in the ALJ's reliance on the claimant's numerical grade as a basis for finding that he possessed a marginal education, stating:  "A numerical grade level is properly used to determine a claimant's educational abilities *only if contradictory evidence does not exist*." *Id.* at 450–51 (citing 20 C.F.R. § 404.1564(b)[3]; *Boone v. Secretary of Health & Human Services*, 595 F. Supp. 758, 759 (E.D. Mich. 1984) (the numerical grade level completed in school may not represent a claimant's actual educational abilities)) (emphasis added); *see also Bailey v. Heckler*, 576 F. Supp. 621, 623 (D. D.C. 1984) (a claimant's grade level completion is not conclusive evidence of his educational abilities).

---

[3]  20 C.F.R. § 404.1564(b) states as follows:

Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work.  Therefore, *the numerical grade level that you completed in school may not represent your actual educational abilities*. These may be higher or lower.  However, *if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities*.

(Emphases added.)

Here, as in *Skinner*, contradictory evidence exists to demonstrate that Matthews has less than a high school education, at least for purposes of determining what jobs, if any, he is capable of performing.  The ALJ should have more accurately accounted for this limited education, including particularly Matthews's limited ability to read, in his hypothetical to the VE.

### Conclusion

As explained above, the ALJ erred in his analysis of the medical opinions of treating physician Dr. Diercksen.  Moreover, the ALJ improperly considered Matthews's education as a vocational factor at step five of the sequential evaluation and did not accurately account for Matthews's reading limitations in his hypothetical to the VE.  Accordingly, I recommend that Matthews's motion (Doc. 6) be GRANTED; the Commissioner's motion (Doc. 11) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 28th day of August, 2014.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).